IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**JOHN KEMP**, individually and as Special
Administrator of the ESTATE OF TERESA
LEANN KEMP**,**

      **Plaintiff/Judgment Creditor,**

      **v.**

**KASTON HUDGINS,**

      **Defendant/Judgment Debtor,**

**and**

**DAIRYLAND INSURANCE COMPANY,**

      **Garnishee.**

**Case No. 12-2739-JAR**

<u>**MEMORANDUM AND ORDER**</u>

In this garnishment action, which was removed in 2012 by Garnishee Dairyland

Insurance Company ("Dairyland"), Judgment Creditor John Kemp seeks to collect from

Dairyland a $5,700,000 judgment against Dairyland's insured, Judgment Debtor Kaston

Hudgins. Kemp alleges that Dairyland should be liable for the full amount of the judgment,

notwithstanding the $50,000 policy limit, because it refused in bad faith to settle the underlying

claim. The matter is before the Court on Dairyland's Motion for Summary Judgment (Doc. 57),

and Kemp's Motion for Leave to File Surreply (Doc. 113). The Court grants Plaintiff's motion

for leave to file a surreply. The summary judgment motion is now fully briefed and the Court has

considered the proposed surreply attached to Plaintiff's motion for leave. For the reasons stated

in detail below, the Court grants Dairyland's motion for summary judgment.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.      Uncontroverted Facts

Before reciting the material uncontroverted facts for purposes of summary judgment, the

---

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

Court notes the unnecessarily voluminous manner in which the parties present what amount to largely undisputed facts.  Indeed, almost all of the facts recited by both parties are undisputed for purposes of summary judgment.  The objections or bases for controverting the remaining facts can be summarized as follows: (1) evidentiary objections; (2) complaints as to the completeness of a referenced document; (3) arguments that the evidence cited by a party does not fully support a stated fact; and (4) complaints that the facts include legal conclusions or arguments.  Kemp has presented 218 statements of additional facts in his response brief, largely based on Dairyland's responses to his 541 requests for admissions.[16]  Given the great many facts that were uncontroverted by the parties in the briefing, and admitted by Dairyland in discovery,[17] this motion could have been presented on largely stipulated facts, saving the parties and the Court time and effort.

With these considerations in mind, the Court has carefully reviewed the evidence submitted in support of the parties' statements of fact.  The following facts are either uncontroverted, or viewed in the light most favorable to Kemp as the nonmoving party.  The Court disregards legal argument presented by either party in their statements of fact, and only considers those facts that are material to issues raised in the motion.  In that vein, the Court does specifically rule on one item of evidence submitted by Kemp in response to summary judgment: the Affidavit of Steve R. Fabert, an attorney who advises insurance clients on issues including

---

[16]The Scheduling Order limited the parties to 25 requests for admissions, not including requests to admit the genuineness of any described document.  *See* Doc. 61 at 6.  Nonetheless, Plaintiff propounded this excessive amount of requests for admissions, in addition to other discovery requests, leading to several motions to compel that derailed the briefing on the instant motion for summary judgment, filed well before discovery was completed.  As a result, although this motion has been on file for more than nine months, it was not fully briefed until June 29, 2015.

[17] The Court sustains Dairyland's objections to statements of facts that wholly rely on admissions submitted by Hudgins.  Admissions under Fed. R. Civ. P. 36 cannot bind a co-party.  *See, e.g.*, *R.J. Alipour v. State Auto. Mut. Ins. Co.*, 131 F.3d 213, 215 (N.D. Ga. 1990).

methods for avoiding liability in excess of policy limits.[18]  Fabert asserts his professional opinion "that Dairyland Insurance Company breached the duties it owed to Kaston Hudgins both before and after suit was filed against him by John Kemp. . . .  There were multiple breaches of duty both before and after suit was filed, each of which played some causal role in producing the ultimate judgment,"[19] and attaches a report setting forth the "factual and legal" basis for this conclusion.  Kemp does not cite with particularity to this report and instead appears to incorporate it by reference; Dairyland merely acknowledges that the report is attached to the summary judgment response but does not respond with particularity to the opinions therein.  The Court disregards this report as an inappropriate legal opinion about the ultimate issue in this case: whether the insurance company breached the standard of care and caused the excess judgment to be entered against Hudgins.[20]

On July 16, 2009, Defendant/Judgment Debtor Kaston Hudgins collided the vehicle he was driving into a vehicle driven by Teresa Kemp ("Mrs. Kemp").  Taylor Kemp ("Taylor"), Mrs. Kemp's thirteen year-old daughter, was a passenger in Mrs. Kemp's vehicle and was pronounced dead at the scene.  Mrs. Kemp was transported to a hospital, but ultimately died on July 22, 2009, as a result of injuries she sustained in the accident.  Plaintiff/Judgment Creditor John Kemp is Mrs. Kemp's husband and Taylor Kemp's father.

Ashley Kelley, Hudgins' girlfriend, owned the 1997 Nissan Maxima Hudgins was driving at the time of the collision.  Kelley told an investigating officer that on the day of the accident Hudgins asked her for the keys to her car and began "making a scene" while they were visiting a hospital; that she did not want to give the keys to Hudgins because he had been

---

[18]Doc. 106-68, Ex. 152.

[19]*Id.* ¶ 8.

[20]Fed. R. Evid. 704; **Error! Main Document Only.***Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007); *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003).

drinking; that an argument ensued between her and Hudgins; that she then relented and gave Hudgins the keys to her car; that she left Hudgins in the parking lot of the hospital with the keys, and went back inside; and that she returned some time later and noticed the car was gone.  She reported to Freeman Hospital Security and to the Joplin, Missouri Police Department that Hudgins had taken her car and that he had been drinking.  At the time of the accident, Hudgins was fleeing police at a high rate of speed.

Kelley was the named insured on a policy of automobile insurance issued by Garnishee Dairyland.  Although Hudgins was not a named insured on the Dairyland policy, the policy included liability coverage for permissive users of Kelley's 1997 Nissan Maxima.  He was therefore an "insured person" under the terms of the policy.  The policy covered "damages for which any insured person is legally liable because of bodily injury and/or property damage caused by a car accident arising out of the ownership, maintenance or use of a car."[21]  The declarations of the Dairyland policy stated limits of $25,000 per person and $50,000 per accident for bodily injury liability coverage, and they listed as the sole insured vehicle the 1997 Nissan Maxima driven by Hudgins at the time of the accident.

Dairyland received notice of the accident on July 21, 2009.  By July 24, 2009, Dairyland knew that the potential claims in the case greatly exceeded the bodily injury policy limits available to Hudgins.  Dairyland sent a letter to Kemp dated August 10, 2009, stating that it was the insurance carrier for the at-fault party.  Hudgins was arrested and incarcerated at the Cherokee County Jail on August 13, 2009, on charges of murder based on his conduct that caused the collision; he has been in custody since that date.

---

[21]Doc. 58-1, Ex. C at 3.

*Settlement Discussions Prior to Wrongful Death Lawsuit*

Kemp retained attorney Greg Carter, who sent a letter dated August 17, 2009, to Dairyland adjuster Brian Morris, stating in part: "I am assisting John Kemp in various matters that have arisen since the motor vehicle accident that took the life of his wife and child," and requesting a copy of the policy and the declarations page.[22]  Morris spoke to Carter by telephone on August 19, and informed Carter that Hudgins had been charged with two counts of murder based on his conduct that caused the collision with Mrs. Kemp's vehicle.  Morris followed up by letter dated August 19, 2009: "Pursuant to our discussion, attached is a copy of the declarations page for Ashley Kelley. Please provide the medical bills associated with both Teresa and Taylor's injuries and we will be happy to proceed with getting this claim resolved."[23]  Carter sent Morris the requested medical bills, along with other documentation, on August 26, 2009.

On September 23, 2009, Morris spoke to Carter by telephone and told Carter that Dairyland was going to pay its policy limits on behalf of Hudgins.  They discussed that the pleadings would need to be filed in Kansas and Morris was going to check with Dairyland's attorney, Bob Wulff with Evans & Dixon, to determine the appropriate venue to file the case.  They did not discuss any claim or settlement involving Kelley.  On September 23, 2009, Morris sent a letter to Wulff, attaching "information for the minor settlement and wrongful death claim for Theresa and Taylor Kemp.  We have offered up our policy limits of $25,000 on both of the claimants."[24]

On October 26, 2009, attorney Brian Groh of Evans & Dixon sent Morris an engagement letter and stated that he and his associate Jessica Beever would be working on the case.  The

---

[22]Doc. 58-2, Ex. D.

[23]Doc. 58-2, Ex. E.

[24]Doc. 58-2, Ex. G.

letter concluded: "We will be filing a friendly suit shortly to obtain the court's approval for settlement."[25]

During the period between October 26, 2009, and February 10, 2010, Evans & Dixon represented Hudgins regarding the matters and claims resulting from the July 16, 2009 vehicle collision.

On November 11, 2009, Beever sent an email to Carter, attaching a petition for approval of the settlement and a proposed order. She stated: "We'll obviously have to iron out the actual settlement agreement," and asked Carter to fill in the section on attorneys' fees and expenses in the proposed order. Carter determined that the petition and proposed journal entry attached to Beever's email contained errors. The petition identified the wrong Kansas county in the case caption, it misidentified Kelley as the driver of the at-fault vehicle, and it stated that the payment of $50,000 "shall release Ashley Kelley and her insured," from further claims. Carter also determined that the proposed journal entry contained errors. It stated that Kelley was to appear by and through her attorney and that Kemp had agreed to settle all claims with Kelley and her insured.

On December 2, 2009, Carter and Beever spoke by telephone. Carter told Beever that he needed a release referenced in the petition, that he needed the policy and the declarations page, and that he needed a letter from Dairyland indicating a willingness on its part to pay its policy limits. On December 17, 2009, Beever sent Carter a letter on behalf of Dairyland, stating: "I have been instructed by Dairyland Insurance to offer your client policy limits in the amount of $50,000 ($25,000 per decedent) to settle this case."[26] Beever enclosed a draft of the Settlement Agreement and Release, as well as a copy of the Dairyland policy and declarations page. The

---

[25]Doc. 58-2, Ex. H.

[26]Doc. 58-2, Ex. K.

enclosed Settlement Agreement and Release: (1) identified Kelley, not Hudgins, as the driver of the vehicle involved in the collision; (2) misidentified the date of the collision as July 15, 2009; (3) provided for Kemp's release and discharge of Ashley Kelley, but not of Kaston Hudgins; and (4) provided a signature block indicating that Beever was to sign as the attorney for both Kelley and Sentry, but not as the attorney for either Hudgins or Dairyland.[27]  The proposed Settlement Agreement and Release contained a general release as to "Respondent" and "Insurer." The Agreement defined the Insurer as Sentry, and the Respondent as Kelley.  Hudgins' name does not appear in the December 17, 2009 proposed Settlement Agreement.

During a January 14, 2010 phone call, Carter told Beever that the documents she had forwarded in December contained mistakes, including misidentifying the driver, and that he was correcting them.  On January 20, Carter sent Beever a letter relaying that he had modified the settlement documents.  He stated in the letter that the driver was Hudgins, and not Kelley, and that "[t]he only other change of any significance is that we're submitting this as a petition."[28] Carter faxed Beever the modified documents on January 25, 2010.  The proposed "Settlement Agreement and Release Between John Kemp, the Surviving Spouse of Teresa Kemp (Deceased) and the Father of Taylor Kemp (Deceased) and Kaston Hudgins" that Carter faxed to Beever on January 25, 2010, provided for a release of Hudgins and Dairyland, but not of Kelley, and it called for payment to Kemp of $50,000.  The proposed Settlement Agreement also expressly reserved Kemp's claims against parties other than Hudgins and his insurer, specifically reserving claims against political subdivisions of the State of Kansas, Cherokee County, Kansas, Crawford

---

[27]The parties do not appear to dispute Dairyland's representation in its brief that, "'Sentry Insurance' is used to describe a related group of insurance companies including Dairyland.  In the correspondence, 'Sentry' is used interchangeably."  *See* Doc. 58 at 29 n.5.

[28]Doc. 58-2, Ex. L.

County, Kansas, and their agents, servants, or employees.  It made no reference to any claim being asserted by Kemp against Kelley; and it did not contain any deadline for its acceptance by Dairyland and/or Hudgins.[29]  Evans & Dixon received Kemp's proposed modifications on January 26.

On January 21, 2010, Dairyland transferred the claim file to Scottsdale, Arizona for handling, and reassigned adjustment of the claim from Morris to Dennis Rubenstein.  Rubenstein spoke to Groh on January 27 by telephone.  Groh told Rubenstein that the claimant's attorney did not want to give a release for Ashley Kelley so that he can go after her for negligent entrustment. In that telephone call, Rubenstein told Groh that Dairyland would hold firm and demand that Ashley Kelley be released as part of the settlement.

Groh contacted Carter by telephone on January 27, 2010, advising that Dairyland required a release of Kelley as part of the settlement, and expressing concern about a negligent entrustment claim.  Carter maintains that this was the first mention during negotiations about a potential negligent entrustment claim against Kelley.  Carter told Groh that "we weren't going to release Ashley Kelley if we weren't going to get paid any money for her release."[30]  Groh stated that Dairyland would not pay money for the release of Kelley and that Groh did not believe Dairyland would accept a limited release of Kelley to the extent the settlement proceeds were paid on behalf of Hudgins.  Carter told Groh that his client would proceed with his original understanding of the settlement: payment of the policy limits in exchange for the release of Hudgins only.

---

[29]Doc. 58-2, Ex. N.

[30]Doc. 106-66, Ex. 150 ¶ 25.  Dairyland objects to evidence about this phone conversation on the basis that it is supported by an unauthenticated letter written by Carter and complains that it has not yet had the opportunity to depose Carter. *See* 106-13, Ex. 43.  But Kemp also submits Carter's affidavit, attached as Exhibit 150, which is admissible on summary judgment under Fed. R. Civ. P. 56(c)(1)(A).  The timing of Defendant's motion for summary judgment was entirely within its own control; it filed its motion well before discovery had closed and well before any dispositive motions deadline had been set.

On January 29, Groh called Carter and told him that Dairyland would not proceed with settlement without the release of Kelley, and that he would wait to hear from him. This conversation was not contemporaneously memorialized in writing.

Groh sent a letter to Rubenstein dated January 29, 2010, which stated in part:

> The purpose of this letter is to update you regarding the status of the above-referenced case. . . . Mr. Kemp's attorney has not yet filed a lawsuit regarding the accident giving rise to the claim. The prior Sentry adjuster had initially agreed to pay policy limits to Mr. Kemp to settle the case.
>
> We recently discovered, however, that opposing counsel is only willing to release the driver of the vehicle, Kaston Hudgins, and not the owner of the vehicle, Ashley Kelley. Mr. Kemp wants to pursue a negligent entrustment claim against Ms. Kelley for permitting Mr. Hudgins to drive the vehicle. Because opposing counsel would not agree to release both Mr. Hudgins and Ms. Kelley, the settlement agreement has been rescinded. At this point, I anticipate that Mr. Kemp will file a wrongful death action against Mr. Hudgins and Ms. Kelley in Kansas.
>
> Unless opposing counsel has another settlement proposal, we will wait for him to file a lawsuit before we pursue any further action. We will continue to keep you advised of any developments.[31]

Neither Dairyland nor Evans & Dixon notified Hudgins about the negotiations with Carter to settle the claim for policy limits. Evans & Dixon did not provide Hudgins with any advice before rejecting Kemp's proposal to settle with Hudgins only.

### Discussions with Kemp's New Attorney, Bruce Copeland, after Wrongful Death Case is Filed

Carter referred Kemp to another attorney, Bruce Copeland, after his January 29 phone call with Groh. Kemp signed a Contingency Fee Contract with Copeland on February 4, 2010. The contract provided in part that Copeland shall receive 40% of any funds recovered, except

---

[31]Doc. 58-2, Ex. O.

that there shall be no fee on the first $50,000 recovered from Dairyland.  The agreement also provides that Kemp shall pay all litigation expenses. Between February 4, 2010, and July 7, 2010, Kemp incurred $7917.80 in litigation expenses for his lawsuit against Hudgins.  That bill has been paid in full.

On February 5, 2010, Copeland filed a petition for wrongful death on behalf of Kemp against Hudgins in the District Court of Cherokee County, Kansas.  The case did not name Kelley as a defendant and did not allege negligent entrustment.  After the lawsuit was filed, on February 8, 2010, Carter sent Groh a letter attempting to memorialize their phone conversations on January 27 and January 29, 2010.  He concluded the letter by stating: "In light of Dairyland's rejection of John Kemp's offer to settle with Kaston Hudgins, I referred John Kemp to Bruce Copeland, of Copeland & Brown, early last week."[32]

Groh forwarded this letter to Rubenstein the next day.  Groh and Rubenstein discussed the case on February 11, 2010, by email.[33]  Groh advised Rubenstein that he had spoken to Copeland by telephone that day, that Copeland had filed suit against the driver only, and that Copeland advised he would send a copy of the Petition to Groh if Groh sent an email to Copeland telling Copeland who Groh represented.  Groh and Rubenstein discussed whether Sentry would represent the driver and asked Rubenstein whether "Sentry decided whether it is going to offer the driver a defense or coverage?"  Rubenstein responded that "we would insure the named insured on the asserted negligent entrustment case + the driver as well.  Would you have any conflict in representing both?"  Groh responded that it would depend on whether there was some issue about whether the driver had permission from the owner and advised that he would get back to him on that question.  Groh told Rubenstein that Dairyland may want to file an

---

[32]Doc. 58-2, Ex. P at 2.

[33]Doc. 106-55, Ex. 139 ¶ 224; Doc. 58-3, Ex. R.

interpleader action and consider joining the owner as a party "so that everyone is before the court." Rubenstein directed Groh to advise Copeland that "it will be a release as to both the named insured and the asserted permissive driver so we are clear from the get/go. If he will not provide a copy of the suit, please send a runner or go on-line and get us what we will need." Rubenstein received the Petition, enclosed with a letter from Groh, on February 17, 2010.

On February 24, 2010, Kemp filed a motion in the wrongful death lawsuit seeking appointment of a guardian ad litem for Hudgins because he "is, or may be, incapacitated to the extent that a guardian ad litem is necessary for Defendant in this action."[34] Neither Dairyland nor Evans & Dixon sought the appointment of a guardian ad litem for Hudgins. There is no indication in the summary judgment record that this motion was granted.

On March 4, 2010, Groh sent a letter to Copeland stating:

> As we recently discussed, my firm has been retained by Dairyland Insurance Company to defend Mr. Hudgins in the above captioned case. We will be entering our appearance and filing a responsive pleading shortly. At this point, Dairyland Insurance has authorized me to settle this case for the policy limits of $50,000.00. In return for the settlement, we would need a release of both Mr. Hudgins as well as Ms. Kelley who is the named insured on Dairyland's policy.
>
> Please review this offer with your client and let me know if he is interested in settling at this point.[35]

The letter was not copied to either Hudgins or Kelley.

On June 21, 2010, Copeland sent a letter to Groh stating:

> I send this letter on behalf of our client, John Kemp, to offer to settle with Kaston Hudgins the claims asserted in the above case. The settlement proposal set forth herein is structured such that, if accepted by Kaston Hudgins, he will incur no financial

---

[34]Doc. 106-16, Ex. 47.

[35]Ex. 58-3, Ex. T.

obligation and have no financial risk on the claims asserted against him in this lawsuit.
. . . .

On behalf of Mr. Kemp, we offer to settle with Kaston Hudgins on the following terms:

    1.  Kaston Hudgins would consent to and stipulate to judgment against him on Count I of the Petition in the amount of $4,275,000.00, plus court costs and statutory post judgment interest.  He would consent to and stipulate to judgment on Count II in the amount of $985,000.00, plus court costs and statutory post judgment interest;

    2.  Kaston Hudgins would assign all of his rights and claims, whether by contract, tort, statute or common law which Kaston Hudgins has against Dairyland Insurance Company, Sentry Insurance Company and all officers, employees, representatives and agents of said insurance companies for any matters or claims which Kaston Hudgins has against any or all of said parties for any reason whatsoever; and

    3.  Plaintiff would execute a covenant not to execute against any assets of Kaston Hudgins other than his rights and claims referenced in Paragraph 2 above.

    The above offer is conditioned on, and subject to, the Court's acceptance of same and entry of a judgment consistent with the settlement.

    As mentioned above, if this settlement offer is accepted by Kaston Hudgins he would have no financial obligation or risk to John Kemp or on the claims asserted in the above-referenced lawsuit.

    This offer will be left open for Mr. Hudgins' acceptance through 5:00 p.m. on July 12, 2010 at which time it is withdrawn. In the meantime, I will do my best to provide any additional information which Mr. Hudgins or his representatives may reasonably request.[36]

Groh communicated with Rubenstein on June 22, and relayed Copeland's offer.

---

[36]Doc. 58-3, Ex. U.

On June 23, Groh sent letters to both Rubenstein and Hudgins, enclosing Copeland's June 21 letter. Groh instructed Hudgins to call him if he was interested in the settlement offer and advised him of his right to retain other counsel to advise him. In Groh's letter to Rubenstein, he stated:

> You will note that Mr. Hudgins is currently residing at the Cherokee County Jail. You may recall that he was in a state mental health institution, but has now been deemed competent . . . [and] transferred back to jail. . . . Of course, it is impossible to predict whether or not Mr. Hudgins will agree to plaintiff's settlement offer. Given his lack of assets and the likely possibility of spending the next several years in prison, he may not be eager to accommodate plaintiff's counsel. I believe the best strategy from here on is to assume that Mr. Hudgins will accept the current offer or a future offer and that a bad faith claim will eventually be filed.[37]

Groh recommended filing an interpleader action, to which Kelley would be a necessary party, provided some advice to Rubenstein about the potential for a bad faith claim by Kemp based on Dairyland's failure to settle the case without a release of Kelley, and conveyed his opinion that Dairyland's conduct did not constitute bad faith. Groh explained that Dairyland would have to retain separate counsel to file the interpleader action and then seek a declaratory judgment on bad faith; he asked Rubenstein to advise his firm if Dairyland would be obtaining counsel to file the interpleader/declaratory judgment action.

On June 29, 2010, Hudgins' criminal defense attorney, Samuel J. Marsh, sent a letter to Groh stating that he will not be advising Hudgins on the wrongful death action, and suggesting that Hudgins should have a guardian ad litem or independent counsel appointed to advise him in this matter. Marsh also stated:

> It would appear to me that the Plaintiff is seeking a bad faith claim against the insurance company. I am court appointed in the

---

[37]Doc. 58-4, Ex. NN.

criminal matter.  While I have not inquired as to Kaston Hudgins
or Ashley Kelley's financial situation, my best guess would be
they have no resources to satisfy a judgment, particularly in excess
of $5,000,000.00.[38]

Neither Hudgins nor Dairyland, nor anyone on their behalf, accepted the proposal in Copeland's

June 21, 2010 letter by the July 12 deadline.  Neither Dairyland nor its attorneys followed

Marsh's suggestion to appoint a guardian ad litem or independent counsel for Hudgins.

On July 8, 2010, James Foland of the law firm Foland, Wickens, Eisfelder, Roper &

Hofer, P.C., ("FWERH") wrote to Copeland explaining that his firm had been retained to

represent Dairyland with respect to the claims filed by Kemp against Hudgins.  He stated that

Dairyland had reviewed the materials Kemp had provided in support of damages, and that:

> Based upon those materials and the other facts Sentry has learned
> through its investigation of this accident, we hereby offer, on
> behalf of Sentry, to settle Mr. Kemp's claims against Mr. Hudgins
> for the limits of the liability coverage of the policy covering Mr.
> Hudgins.  Specifically, Sentry offers to pay to Mr. Kemp the
> amount of $25,000 for the death of Mrs. Kemp in exchange for a
> release of Mr. Hudgins, and Sentry offers to pay to Mr. Kemp the
> amount of $25,000 for the death of Taylor in exchange for a
> release of Mr. Hudgins.[39]

Copeland responded to Foland's letter the following day:

> From the content of your letter I assume that either Mr.
> Hudgins or Mr. Hudgins' attorneys have provided either Sentry
> Insurance or your office with my June 21 letter and enclosures
> provided therein to Mr. Hudgins' attorneys in conjunction with my
> settlement offer made to Mr. Hudgins.  While I appreciate that
> Sentry Insurance has had the opportunity to review the materials I
> provided to Mr. Hudgins' attorneys in conjunction with my
> settlement offer made to Mr. Hudgins (many of which were
> previously provided to Sentry Insurance before my involvement),
> my settlement offer was made to Mr. Hudgins, the only defendant
> in the above-captioned case. As your letter does not indicate your
> representation of Kaston Hudgins, I will not consider it as his

---

[38]Doc. 106-21, Ex. 57.

[39]Doc. 58-3, Ex. X.

response to my June 21 settlement offer, which therefore remains open for Mr. Hudgins' acceptance through 5:00 p.m. on July 12, 2010.  Given that my settlement offer made to Mr. Hudgins costs Mr. Hudgins no money and eliminates all financial risk he might have on the claims asserted in the above-captioned lawsuit, I have every reason to believe that his attorneys will recommend and advise him to accept my offer.  It seems to me that to advise otherwise exposes Mr. Hudgins personally for the amount of judgment I am confident I will obtain for my client against Mr. Hudgins if he fails to accept the settlement offer currently available to him.

Accordingly, I await Mr. Hudgins' response to my June 21 settlement offer.[40]

On July 12, 2010, James Maloney of FWERH, sent Copeland a letter stating:

As you know, we represent Sentry Insurance with respect to the claims by your client, John Kemp, against Sentry's insured, Kaston Hudgins.  Thank you for your letter dated July 9, 2010. We understand from that letter that you are not considering the offer extended in our letter dated July 8, 2010 to be a response to the offer contained in your correspondence of June 21, 2010.

I am writing to make sure the intention of our letter dated July 8, 2010 was clear.  Sentry is unequivocally offering to settle, on behalf of its insured, Mr. Hudgins, pursuant to the insurance contract between them, to settle Mr. Kemp's claims against Mr. Hudgins for the limits of the liability coverage of the policy covering Mr. Hudgins.  Specifically, Sentry offers to pay, on behalf of Mr. Hudgins, the amount of $25,000 to Mr. Kemp for the death of Teresa Kemp in exchange for a release of Mr. Hudgins, and Sentry offers to pay, on behalf of Mr. Hudgins, the amount of $25,000 to Mr. Kemp for the death of Taylor Kemp in exchange for a release of Mr. Hudgins.

Please contact Jim Foland or me at your next convenience to discuss this offer.  Our hope is still to reach an amicable resolution of this matter.  We look forward to speaking with you.[41]

Neither Foland nor Maloney consulted with Hudgins or obtained his consent before sending the

July 8 and July 12 letters to Copeland.

---

[40]Doc. 58-3, Ex. Y.

[41]Doc. 58-3, Ex. Z.

In a letter dated July 13, 2010, Copeland asked Maloney whether he represented Hudgins. Maloney replied to this letter on July 14, stating, "this law firm represents Sentry Insurance. I trust this answers your questions."[42]

On July 22, 2010, Copeland sent Groh a letter enclosing a handwritten letter from Hudgins that had been forwarded to Copeland by attorney Larry Prauser.[43]  This handwritten letter from Hudgins states that he realizes that the deadline has passed but that "that offer is to except [sic] the proposal Mr. Kemp was wanting additionally, and if he's changed his mind that's fine too.  I want to help anyway possible."[44]  Copeland asked Groh to advise Hudgins to communicate through counsel.  Copeland concluded the letter: "As we discussed earlier this week, you will be providing me with a letter setting forth your request regarding negotiations. When I get your letter, I will arrange a time to meet with Mr. Kemp regarding the same."[45]

Copeland wrote to both Groh and Maloney on July 30.  In his letter to Groh, he stated:

> Thank you for your patience in awaiting my response to your July 22 letter, which reiterated your telephone request of July 16.
>
> I have spent some time considering your request that we renew our June 21settlement offer made to Mr. Hudgins and have discussed same with Mr. Kemp.  As you know, after my June 21 settlement offer was extended to Kaston Hudgins, I received correspondence from attorneys Foland and Maloney written on behalf of their client, Sentry Insurance.  From their letters to me it appears that they forwarded copies to you.  In light of Sentry's position, and after careful consideration and discussion with Mr. Kemp, we are of the opinion that these claims are no longer able to be resolved on the terms we previously offered.[46]

---

[42]Doc. 58-4, Ex. BB.

[43]It appears that Prauser was local counsel for Dairyland in the wrongful death action.

[44]Doc. 106-25, Ex. 64 at 3.

[45]*Id.*at 1.

[46]Doc. 106-26, Ex. 67.

In his letter to Maloney, Copeland apologized for "the delay in responding to Sentry's July 12 counteroffer made on behalf of its insured. . . .  Recently I have had the opportunity to speak with John, and after doing so, am able to advise you that he rejects Sentry's offer as set forth in your July 12 letter.  Obviously, his claims have value far in excess of the amounts which Sentry offered."[47]

On August 4, Foland sent Copeland a letter acknowledging receipt of the July 30 letter and providing the following offer:

> Sentry would like to re-offer the settlement such that Mr. Kemp will have an opportunity to reconsider the offer should he choose to do so.  Accordingly, Sentry is hereby offering to settle, on behalf of its insured, Mr. Hudgins, and pursuant to the insurance contract between them, Mr. Kemp's claims against Mr. Hudgins for the limits of the liability coverage of the policy covering Mr. Hudgins.  Specifically, Sentry offers to pay, on behalf of Mr. Hudgins, the amount of $25,000 to Mr. Kemp far the death of Teresa Kemp in exchange for a release of Mr. Hudgins, and Sentry offers to pay, on behalf of Mr. Hudgins, the amount of $25,000 to Mr. Kemp for the death of Taylor Kemp in exchange for a release of Mr. Hudgins.[48]

On August 15, 2010, Beever and Groh, on behalf of Hudgins, filed a Motion for Leave to File a Third Party Petition in the *Kemp v. Hudgins* case.  The motion sought leave to plead a claim against Deputy Dean Kidd of the Cherokee County Sheriff's office, the officer who was pursuing Hudgins at the time of the collision.  The Evans & Dixon attorneys did not consult with Hudgins before filing this motion.

On August 20, 2010, Copeland wrote to Foland and Maloney, offering to settle with Hudgins for the same stipulated judgment amounts as offered in his June 21 letter to Groh.  In addition, Copeland proposed that:

---

[47]Doc. 58-4, Ex. CC.

[48]Doc. 58-4, Ex. DD.

2.   Dairyland/Sentry Insurance Company would pay to Mr. Kemp
the sum of $50,000.00 which I understand from your July 12
and August 4 letters to be the policy limits of Mr. Hudgins'
coverage with Dairyland/Sentry.  Upon receipt, Plaintiff will
acknowledge receipt of same and would acknowledge a credit
against or partial satisfaction of $25,000 each on the judgments
referenced in Paragraph 1 above;

3.   Kaston Hudgins would assign to Plaintiff John Kemp all of
Kaston Hudgins' rights and claims, whether by contract, tort,
statute or common law which Kaston Hudgins has against
Dairyland Insurance Company, Sentry Insurance Company and
all officers, employees, representatives and agents of said
insurance companies for any matters or claims which Kaston
Hudgins has against any or all of said parties for any reason
whatsoever;

4.   Kaston Hudgins would assign to Plaintiff John Kemp all of
Kaston Hudgins' rights and claims to any future lottery
winnings, as well as any income or royalties from any
publication, book, movie, or television rights which may
evolve from his conduct described in the Petition, the
prosecution of this civil lawsuit and/or the criminal prosecution
asserted against him because of the facts described in the
Petition;

5.   Plaintiff would execute a covenant not to execute against any
assets of Kaston Hudgins other than these matters referenced in
Paragraphs 3 and 4 above; and

6.   Sentry/Dairyland Insurance would provide written consent to
the settlement referenced herein and would acknowledge that
Mr. Hudgins' settlement on these terms is neither a breach of,
nor otherwise invalidates, any provision of Sentry's
Dairyland's insurance policy affording coverage to Kaston
Hudgins.

The above offer is conditioned on, and subject to, the Court's
acceptance of same and entry of a judgment consistent with the
settlement.

This offer will be left open for Mr. Hudgins' acceptance
through 5:00 p.m. on September 3, 2010 at which time it is
withdrawn.[49]

---

[49]Doc. 58-4, Ex. EE.

Foland responded to Copeland on August 23, expressing confusion about whether Copeland would accept a response to the August 20 offer from Dairyland/Sentry on behalf of Hudgins, given Copeland's prior correspondence suggesting that Dairyland's attorneys did not represent Hudgins.  Foland concluded the letter by stating that "Dairyland's offer of $50,000, Mr. Hudgins' policy limits, remains open to your client in exchange for a release of Mr. Hudgins."[50] On August 26, Copeland responded by letter that "To answer your specific inquiry, we would consider a letter from your firm to be a response to Mr. Kemp's August 20, 2010 offer."[51]

On September 3, 2010, Copeland received two letters regarding Copeland's August 20 offer.  Foland responded on behalf of "Sentry/Dairyland," stating that Hudgins "is separately represented by Bryan Groh and we make no representation on their part in our response."  The letter declined Kemp's August 20 offer and then stated:

> On the other hand, Sentry/Dairyland Insurance Company will restate its offer to pay Mr. Kemp $25,000 on each of the two claims now pending for a full settlement against Mr. Hudgins with execution of a release of Kaston Hudgins only.  We make this offer despite the substantial question as to whether or not Mr. Hudgins was a permissive user of our insured's vehicle.[52]

Foland proceeded to explain that his client did not believe the sums proposed by Kemp were fair and reasonable in light of the information that had been furnished to his client and that any sum awarded by a jury would be substantially less. Groh sent Copeland a letter by fax stating:

> We have spoken to our client, Kaston Hudgins, and he is willing to enter into the settlement agreement with you however, I have received Mr. Foland's letter wherein Sentry/Dairyland Insurance Company declines to participate in the settlement. I, therefore, assume that the settlement offer at this point is terminated.[53]

---

[50]Doc. 58-4, Ex. FF.

[51]Doc. 58-4, Ex. GG.

[52]Doc. 58-4, Ex. HH.

[53]Doc. 106-28, Ex. 75.

Rubenstein mailed to Hudgins a reservation of rights letter on behalf of Dairyland on September 24, 2010.  The letter stated Dairyland believed the matter would be resolved promptly by payment of the policy limits, therefore it had not previously sent him a reservation of rights letter.  "In addition, we have now learned that amended criminal charges have been filed against you maintaining the charge that you stole Ms. Kelley's vehicle."[54]  The letter states that it will continue to provide Hudgins with a defense through Groh, but that it reserves its right to deny coverage on the basis that Hudgins did not have express or implied permission to operate Kelley's vehicle.  Groh sent Rubenstein a letter dated January 11, 2011, stating:

> On behalf of my client, Kaston Hudgins, we are demanding that you immediately withdraw the September 24, 2010 reservation of rights letter.  In your letter, you state that the amended criminal charges contain a charge that he stole Ms. Kelly's vehicle.  This statement is patently false.  Both the Amended Complaint and Second Amended Complaint do not have a charge for stealing Ms. Kelly's vehicle.

> In addition, on behalf of Mr. Hudgins, I am demanding that Dairyland Insurance settle this case. We expect the court to grant plaintiff's motion to file an amended petition which would subject Mr. Hudgins to punitive damages in addition to the potentially large compensatory damages that he is facing if this case goes to trial.[55]

Kemp amended the petition in February 2011, to add a survival claim, and the parties eventually stipulated to a trial to the court without a jury.

On March 1, 2011, Copeland sent a letter to Groh and Beever, with copy to Foland and Maloney, providing the terms of settlement authorized by his client, which were very similar to the terms outlined in his August 20, 2010 letter.  It provides for a stipulated judgment in

---

[54]Doc. 106-30, Ex. 77.

[55]Doc. 106-48, Ex. 130.

similarly high amounts on each claim, but it provides for Kemp dismissing with prejudice his

punitive damages claim.  It further provides that

> Dairyland Insurance would also agree that Mr. Hudgins' settlement
> on these terms is fair and reasonable based on the claims asserted
> against Kaston Hudgins, is not collusive, and is entered into in
> good faith and as a means of amicably resolving the dispute
> between Plaintiff John Kemp and Defendant Kaston Hudgins.
> Dairyland would agree not to challenge or contest the
> reasonableness of the amounts of such judgments in any bad faith
> or negligence proceeding brought against it, as referenced in
> Paragraph 3 above.[56]

The letter also attempted to address Foland's concerns about the last settlement offer, including

the permissive use issue.  Copeland states that the "permissive use issue has been withdrawn by

Dairyland."  As to Foland's position that the damages amount is unreasonable, Copeland urged

that the potential verdict range is in line with his demand, and that the Kansas Supreme Court is

set to determine the constitutionality of certain statutory damages caps that would apply in this

case.  Copeland stated that the offer remained open until March 16, 2011.

On March 11, 2011, Groh wrote a letter to Rubenstein, providing him with a case

analysis as to damages exposure for Hudgins, and again asked Dairyland to settle the case before

trial in order to limit Hudgins' personal financial exposure.

On March 16, 2011, Foland replied to Copeland's letter.  He characterized Kemp's

demand as unreasonable and stated that Dairyland continued to defend Hudgins "without

reservation of rights."  Foland stated that part of its defense included its "continued offer of the

policy limits of that policy to settle the case you have for your clients against Mr. Hudgins.  We

again ask that you accept that offer to resolve these matters."[57]  Copeland essentially rejected this

offer by letter to Groh dated March 23, 2011, where he states that "there is not a shadow of a

---

[56]Doc. 58-4, Ex. JJ.

[57]Doc. 58-4, Ex. KK.

doubt in anyone's mind that Plaintiff's claims will result in a seven-digit judgment," and that "Dairyland's refusal to agree to a consent judgment/covenant not to execute settlement and Dairyland's refusal to offer more than $50,000 to settle Plaintiff's claims, it leaves Plaintiff with no reasonable option but to proceed to trial."[58]  Consistent with Copeland's representation in this letter, in his answers to Dairyland's interrogatories, Kemp states his reasons for declining Dairyland's repeated offers of a policy limits settlement after the lawsuit was filed: "I felt that the value of my claims was more than $50,000."[59]

Copeland and Foland exchanged letters throughout March 2011, disputing whether Dairyland controlled the settlement negotiations, whether it was preventing Hudgins from protecting his own financial interests by rejecting the settlement offer, and whether it was unreasonable for Dairyland to offer only $50,000, given the evidence of damages in the case.

Groh wrote Foland on March 24, 2011, again asking that Dairyland settle Kemp's claims against Hudgins.

On April 1, 2011, Foland initiated settlement discussions with Copeland to settle the claims arising out of the collision, as well as "any claims arising out of the handling, defense, or actions taken by Dairyland or any of its agents or employees."[60]  Dairyland offered Kemp an amount exceeding the policy limits in order to settle both the underlying lawsuit and any claim arising out of the claims handling and defense of the claim.  The parties were unable to reach a settlement agreement on the combined matters.  The settlement amount offered by Dairyland was unacceptable to Kemp, and Kemp was unwilling to release Kelley, as demanded by Dairyland.  Dairyland's attorneys did not communicate with Hudgins about these settlement discussions.

---

[58]Doc. 58-4, Ex. LL.

[59]Doc. 58-3, Ex. V, nos. 12–16.

[60]Doc. 106-32, Ex. 87.

Trial of the underlying lawsuit began on April 6, 2011, and ended on April 8, 2011. Dairyland paid its $50,000 coverage limit into court on May 11, 2011. The court entered judgment in favor of Kemp and against Hudgins on August 23, 2011, in the following amounts: $3,232,604.67 on Count I, $2,090,561.40 on Count II, and $438,142.94 on the survival claim in Count III, for a total award of $5,761,309.01, plus costs and post-judgment interest. The original judgment also included a $5,000,000 punitive damages award, which was amended on August 9, 2012, to $5406.

Hudgins appealed, but the Kansas Court of Appeals affirmed the amended judgment; the Kansas Supreme Court denied review. Plaintiff, as judgment creditor, filed a Request for Garnishment on October 18, 2012, naming Hudgins as the Judgment Debtor and Dairyland as the Garnishee.[61] The court issued an Order of Garnishment[62] and Dairyland filed its Answer, claiming that it held no money for and was not indebted to the judgment debtor.[63] On November 15, 2012, Plaintiff filed a Reply to Dairyland's Answer, asserting that Dairyland was indebted to Hudgins; alleging that Dairyland acted negligently and/or in bad faith in settling the underlying claim; and seeking judgment against Dairyland in the amount of $5,766,715.01, plus interest, costs and attorneys' fees.[64] On November 21, 2012, Dairyland filed its Notice of Removal to this Court.[65]

---

[61]Doc. 1, Ex. A at 67.

[62]*Id.* at 56.

[63]*Id.* at 21.

[64]*Id.* at 9. The parties did not discuss in their summary judgment papers whether Hudgins had assigned his bad faith claim to Kemp, nor whether an assignment was required. In order to assure itself that Plaintiff had standing to assert this claim, the Court directed the parties to brief this issue and they each filed a timely response Docs. 123, 124, 125. Although Hudgins never assigned his claim of bad faith against Dairyland to Kemp, under Kansas law no assignment is necessary in order for a garnishor, as a third-party beneficiary of the underlying insurance contract, to assert a claim that the insurance company breached its duty to exercise reasonable care in good faith in its settlement efforts on behalf of the insured. *Moses v. Halstead*, 581 F.3d 1248, 1255 & n.4 (10th Cir. 2009). The Court is satisfied upon receipt of the filings in response to its Notice and Order to Show Cause that Kemp has standing to raise this bad faith refusal to settle claim and declines Kemp's invitation to remand the matter

### III.      Discussion

The parties agree that in this diversity case, the Court must apply Kansas state law.  In the absence of clear authority from the Kansas Supreme Court, this Court must predict how the Kansas Supreme Court would rule on the issue.[66]  To do this, the Court is to look to "analogous decisions by the state supreme court, decisions of lower courts in the state, decisions of federal and other state courts, and the general weight and trend of authority."[67]

Under Kansas law, when an insurance company negligently or in bad faith rejects an insured's offer to settle a claim within policy limits, it constitutes a breach of contract and gives rise to liability for judgment in excess of the policy limits.[68]  Kansas courts have explained that when "a claim is made against an insured for an amount in excess of the policy coverage, the insured's obligation to defend creates a conflict of interest on its part.[69]  The insurer is required to give at least equal consideration to the insured's interest to settle within policy limits when negotiating a settlement.[70]  Although the insurer's duties are based in contract, Kansas courts use tort concepts to define the standard of care.[71]  Therefore, particularly where a settlement offer approaches policy limits, "the insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim."[72]  Bad faith requires more than "mere error of judgment."[73]

---

to state court.

[65] Doc. 1.

[66] *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006).

[67] *First State Bank v. Daniel & Assocs., P.C.*, 519 F. Supp. 2d 1157, 1160–61 (D. Kan. 2007) (citing *MidAmerican Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006)).

[68] *See, e.g.*, *Roberts v. Printup*, 595 F.3d 1181, 1186 (10th Cir. 2010).

[69] *Bollinger v. Nuss*, 449 P.2d 502, 510 (Kan. 1969).

[70] *Id.*

[71] *Id.*; *Roberts*, 595 F.3d at 1186.

[72] *Id.* at 511.

In *Bollinger*, the court recited the following factors that courts should consider "in deciding whether an insurer's failure to settle constituted a breach of its duty to exercise good faith":

> (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.[74]

In addition to these factors, the Court is to consider "relevant aspects of the third-party plaintiff's conduct, including any responsibility the plaintiff might have for the insurer's lack of adequate information . . . and the reasons the plaintiff had for declining to entertain an offer after expiration of a deadline."[75]

Dairyland moves for summary judgment on the bad faith claim on the following grounds: (1) Dairyland properly refused to settle for policy limits in exchange for a release of Hudgins because it would have violated a duty of good faith toward Kelley as its other insured not to require a release of both; and (2) Kemp cannot show that Dairyland's refusal to settle for policy limits in January 2010 was the cause of the settlement failure because Kemp manufactured a bad faith claim.  Kemp responds that (1) Dairyland could have accepted the original settlement offer without releasing Kelley because negligent entrustment claims were not covered by the policy; (2) Dairyland's position that it was required to obtain a release of Kelley in order to settle the

---

[73]*Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

[74]*Roberts*, 595 F.3d at 512.

[75]*Wade*, 483 F.3d at 670.

underlying case is insufficient under governing law to negate bad faith; (3) Kemp incurred

litigation expenses between the time of the January and March offers by Dairyland, so he was

justified in rejecting the later offer due to a change in circumstances; (4) the Court should

consider the facts and circumstances of the entire settlement negotiation process under the

*Bollinger* factors, which weigh in favor of his bad faith claim.  In addressing these issues, the

Court finds it helpful to consider Dairyland's conduct with respect to two time periods: (1)

between September 23, 2009 and January 29, 2010, when the parties were negotiating the

specific terms of a policy limits settlement agreement; and (2) after the lawsuit was filed.

### A. Dairyland's Conduct Prior to January 29, 2010

The settlement negotiations in this case began with little controversy.  The summary

judgment record does not make clear which party "offered" the original policy limits settlement,

but it is uncontroverted that Dairyland quickly agreed in principle to settle this matter for its

policy limits.  It did not dispute that its insured, Hudgins, was the at-fault party of the vehicle

collision, and it was aware that Kemp's damages would far exceed the policy limits of $50,000.

There is no allegation that either party delayed in providing information to the other that was

necessary in order to determine fault or judge a settlement offer.  It is also uncontroverted that

Dairyland's first two drafts of the settlement papers contained information that both parties

would find erroneous such as the incorrect court venue, and incorrectly naming Kelley as the

driver of the vehicle.  The evidence suggests the parties did not discuss any potential claim

against Kelley as the owner of the vehicle, for negligent entrustment or otherwise, until

Dairyland circulated the second draft of the settlement papers.  Only then did Dairyland

understand that Kemp would not agree to release Kelley, and only then did Dairyland suggest to

Kemp that it required a release of Kelley on the basis of a potential negligent entrustment theory of liability.

Dairyland insists that it would have breached its duty of good faith to Kelley, had it accepted Kemp's initial settlement demand to release only Hudgins in exchange for the policy limits.  Kemp contends that Dairyland would not have breached any duty to Kelley by settling because the policy did not cover negligent entrustment claims, and suggests that Dairyland failed to reasonably investigate its potential liability on such a claim under Kansas law.  Kemp also points out that Dairyland later offered to settle the matter as to Hudgins only, suggesting that it understood that a release of Kelley was not required under Kansas law.

The Court agrees with Dairyland that its rejection of Kemp's initial offer to settle without a release of both insureds was not in bad faith because Dairyland reasonably believed it owed a duty of good faith toward both insureds—Hudgins and Kelley—to obtain a release of both.  In *Brummett v. American Standard Insurance Co.*,[76] Judge Marten considered a bad faith claim against an insurer under similar facts.  The court granted the insurer's motion for summary judgment on the claimant's bad faith claim because the evidence showed

> that American Standard was willing to pay its policy limits, but simply refused to enter into a settlement which would have exhausted the policy limits while explicitly preserving the right of Brummett to proceed against Schwab.  Plaintiffs have not cited any Kansas case in which bad faith liability has been predicated on the failure of an insurer to agree to a settlement of some but not all of its insureds.  Authority from outside Kansas rejects such an imposition of liability, because "an insurer's duty extends to all of its insureds [and so] an insurer may, within the boundaries of good faith, reject a settlement offer that does not include a complete release of all of its insureds."[77]

---

[76]No. 04-1114-JTM, 2005 WL 1683610 (D. Kan. July 18, 2005).

[77]*Id.* at *12 (quoting *Strauss v. Farmers Ins. Exch.*, 31 Cal. Rptr. 2d 811 (Cal. Ct. App. 1994)).  In fact, under California law, to establish a wrongful refusal to settle claim against the insurer, an insured must first show that the settlement offer provides for a complete release of all insureds.  *Graciano v. Mercury Gen. Corp.*, 179 Cal. Rptr. 3d 717, 726 (Cal. Ct. App. 2014).

Similarly, in this case the uncontroverted facts establish that Dairyland quickly offered to pay its policy limits to Kemp to settle the claim.  The only point of contention between the parties was whether the policy limits settlement would be in exchange for a release of Hudgins, or of Hudgins and Kelley.  Although Kemp did not ask to explicitly reserve his right to pursue a negligent entrustment claim against Kelley, the Court finds that this is a distinction without consequence.  Whether or not Kemp explicitly reserved his right to pursue a claim against Kelley, under a negligent entrustment theory or otherwise, his refusal to release Kelley left her open to liability after Dairyland exhausted its policy limits in settling the claims against Hudgins. For the same reasons explained by Judge Marten in *Brummett*, the Court finds that Dairyland's rejection or repudiation of the initial settlement offer was within the bounds of good faith because it did not include a release of both insureds.[78]

Plaintiff responds that under Kansas law, coverage for "ownership, maintenance, operation, and use" of a vehicle does not include negligent entrustment claims, so it was not reasonable for Dairyland to demand a release of Kelley based on this theory of liability.  The Court agrees with Dairyland that the authority relied upon by Kemp does not dictate that Dairyland refused to settle in bad faith.  Kemp relies on the Kansas Supreme Court's decision in *Upland Mutual Insurance, Inc. v. Noel*, which construed a provision in a homeowner's liability policy that excluded from coverage claims based on the "ownership, maintenance, operation, [or] use . . . of . . . automobiles . . . while away from the premises."[79]  The court agreed with the insured in *Upland*, that the exclusion clause in this policy did not exclude coverage for a

---

[78]The Court is not persuaded by Kemp that *Dairyland Insurance Co. v. Herman* dictates a different result. That case construed New Mexico law following certification from the New Mexico Supreme Court about the insurer's duty to minimize its insured's liability under New Mexico law.  134 F.3d 382 (10th Cir. 1998) (unpublished table decision).   The case involved Dairyland's insistence on releasing a subrogation claim as part of the settlement, not a release of both insureds when they both appeared susceptible to liability.  *Id.*

[79]519 P.2d 737, 741 (Kan. 1974).

negligent entrustment claim because such a claim did not directly relate to ownership, maintenance, operation, or use of the vehicle.[80]   A negligent entrustment claim is based on the negligence of the entruster in supplying the automobile, not on the negligence of the driver.[81]

There are several important differences between the policy provision in *Upland* and the policy provision at issue here.  First, the policy language here is not an exclusion, so the narrow construction rule applied in *Upland* does not apply.[82]  Second, this case does not involve an exclusion clause in a homeowner's liability policy; it is a coverage provision in an automobile policy.  As the Kansas Court of Appeals noted in declining to extend *Upland* to uninsured motorist cases: "We do not believe the Supreme Court intended for its decision in *Upland Mutual* to apply to uninsured motorist cases, nor do we believe it applicable to cases which do not involve exclusion clauses under homeowner's liability policies."[83]

Moreover, on a claim of wrongful failure to settle the Court is not called upon to determine whether the negligent entrustment claim was covered by the policy as a matter of law. Instead, the Court is to evaluate "the offer and strength of the plaintiff's case . . . as they fairly

---

[80]*Id.*

[81]*Id.* at 742.

[82]*Id.* at 741 ("exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitation on that coverage in clear and explicit terms."); *see also Crist v. Hunan Palace, Inc.*, 89 P.3d 573, 879–80 (Kan. 2004) (declining to overturn *Upland*, and articulating *Upland's* holding as follows: "For many years the law in Kansas has been clear that an insurance exclusion for damage or injury arising from an automobile will not exclude a claim based upon negligent supervision.").

[83]*State Farm Mut. Auto. Ins. Co. v. Cummings*, 778 P.2d 370, 376 (Kan. Ct. App. 1989), *abrogated on other grounds by Cashman ex rel. Cashman v. Cherry*, 13 P.3d 1265 (Kan. 2000); *see also Marrero v. Corporacion de Renovacion Urbana y Vivienda*, 658 F. Supp. 443, 445–46 (D. Puerto Rico 1987) (discussing the *Upland* approach to negligent entrustment cases and explaining that "[h]ad there been an automobile liability policy the issue would not have reached the Court."); *Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co.*, 821 F.2d 671, 676 (D.C. Cir. 1987) (rejecting the *Upland* "minority view" and observing that "this view has typically appeared in situations where the defendant evidently lacked any other insurance.").  *But see Ashton v. Nat'l Farmers Union Property & Cas. Co.*, No. 11-4002-SAC, 2012 WL 2814129, at *6 (D. Kan. July 10, 2012) (applying *Upland* to a coverage provision in an automobile insurance policy).

appeared to the insurer and its agents and attorneys at the time the offer was refused."[84]  Given the distinctions explained above, the Court finds that it was not clear to Dairyland that *Upland* would apply to this policy provision and not require it to defend a negligent entrustment claim against Kelley.  While it is true that Judge Crow later determined in an unpublished decision that *Upland* applied to a coverage clause in an automobile policy, this decision was issued in 2012, well after Dairyland refused to settle without a release of Kelley.[85]  The Court is not to view the conduct of the insurer through hindsight.[86]

It is uncontroverted that both Kelley and Hudgins were "insureds" under the policy, and Kemp has pointed the Court to no evidence that Dairyland lacked a good faith belief that it had a duty to defend Kelley if Kemp pursued a negligent entrustment claim.  The correspondence between Rubenstein and Groh demonstrate that they were concerned about the prospect of such a claim given the facts.  They knew that Kelley permitted Hudgins to take her keys and that she made a statement acknowledging that she knew he had been drinking.  It was Kelley who called the police to report that Hudgins was driving her vehicle drunk.  Indeed, Rubenstein advised Groh in February 2010, that Dairyland intended to "insure the named insured on the asserted negligent entrustment case + the driver as well."[87]  The fact that Carter demanded additional consideration from **Dairyland** to release Kelley suggests that Kemp believed any potential negligent entrustment claim would be covered by the insurance policy too.  And it is undisputed that the potential liability would far exceed the policy limits whether Kemp pursued one or both

---

[84]*Glenn v. Fleming*, 799 P.2d 79, 85 (Kan. 1990); *Bollinger v. Nuss*, 449 P.2d 502, 513 (Kan. 1969).

[85]*Ashton*, 2012 WL 2814129, at *6.

[86]*Glenn*, 799 P.2d at 85.

[87]Doc. 58-3, Ex. R.

insureds.  As with any claim against Hudgins, Dairyland knew that the damages would far exceed the policy limits.

Dairyland admits that it did not inform Hudgins about the policy limits settlement offer or that Dairyland refused to settle without a release of Kelley.  But prior to January 2010, Hudgins was in state custody pending criminal charges related to this case and was apparently not represented by non-criminal counsel.  There is some evidence that he was in a mental health institution for some part of this period.  Once Groh took over his representation, it appears that he worked to protect Hudgins' interests and keep him informed of the settlement negotiations. More importantly, Dairyland was willing to pay the policy limits in exchange for a complete release of the insureds.  Kemp cannot explain how Hudgins could have protected his own interests any further had he known about these settlement discussions for policy limits, and how his knowledge would have changed the course of this litigation.[88]  Under the circumstances, there is no genuine issue of material fact that Dairyland gave equal consideration to the interests of Hudgins as it did to its own interests in this matter.

Kemp argues that Dairyland's offer to settle for its policy limit in exchange for a release of Hudgins in July demonstrates that it did not hold a reasonable belief in January that it could not settle without a release of Kelley.  But this evidence, viewed in the light most favorable to Plaintiff, does not demonstrate that Dairyland's demand in January 2010 for a release of both insureds was in bad faith.  As described above, the Court must look to the facts as they appeared to Dairyland at the time they rejected the January offer, and there is no evidence in the record that Dairyland did not have a good faith belief that it owed a duty to protect Kelley at that time, before the suit was filed.  Notably, when Dairyland made the later offer to release Hudgins on

---

[88]*See Wade v. EMASCO*, 483 F.3d 657, 671 (10th Cir. 2007).

July 8 and 12, it was after Kemp had filed suit against Hudgins only.  Kemp had not asserted a negligent entrustment claim against Kelley and Dairyland had no reason to believe Kemp would assert such a claim at that point.  "An insurance company acting honestly and in good faith upon adequate information should not be held liable because it failed to prophesy the result."[89]  An error of judgment is not sufficient to show bad faith.[90]

Again, there is no dispute that Dairyland offered its policy limits.  None of the Kansas case law relied on by Kemp required Dairyland to offer more than its policy limits in order to fulfill its duty to settle in good faith before the lawsuit was filed.[91]  Dairyland did not delay its policy limits offer in order to obtain more information and it never contested that Hudgins was the at-fault party, or that he was an "insured" under the policy.[92]  There was no bad faith in refusing to accept a settlement offer that required additional consideration, beyond the policy limits, for the release of both insureds.  Indeed, Kemp has never explained why he was insistent on not releasing Kelley given that he never ultimately sought to recover against her on a negligent entrustment theory or otherwise.  There is no genuine issue of material fact that Dairyland believed it was required to seek a release of both insureds during this initial period of settlement discussions, and no reasonable jury could conclude that it failed to negotiate in good faith.[93]

---

[89]*Glenn*, 799 P.2d at 85; *Bollinger*, 449 P.2d at 514.

[90]*Glenn*, 799 P.2d at 85; *Bollinger*, 449 P.2d at 514.

[91]*See, e.g.*, *Glenn*, 799 P.2d at 86 (finding no bad faith where insurer rejected policy limit offer that was "premature, had conditions attached to it, and was only open for two weeks."); *Bollinger*, 449 P.2d at 514 ("Whether an insurer in defending a claim and refusing an offer of settlement within policy limits was negligent or acted in bad faith is a question for the trier of fact in each case."); *Rector v. Husted*, 519 P.2d 634, syl. ¶ 2 (Kan. 1974); *Covill v. Phillips*, 452 F. Supp. 224, 226 (D. Kan. 1978) ("Good faith further compels an insurer to base any rejection of a compromise offer approaching the policy limits upon an honest belief that it can defeat the action or keep any possible judgment within the limits of the policy coverage.").

[92]Dairyland's reservation of rights letter was sent much later in September 2011.

[93]*Brummett v. Am. Std. Ins. Co. of Wisc.*, No. 04-1114-JTM, 2005 WL 1683610, at *13 (D. Kan. July 18, 2005) ("The settlement, on the conditions insisted on by Brummett, was doomed because American Standard was

### B.  Dairyland's Conduct After January 29, 2010

After the initial policy limit settlement discussions fell through, Kemp retained new counsel and filed suit against Hudgins only.  From this point on, the only policy limit settlement offers were made by Dairyland.  And Dairyland repeatedly offered its policy limits.  On March 4, 2010, Groh offered Dairyland's policy limits in exchange for a release of both insureds. Kemp did not respond to Dairyland's offer.  More than two months later, Kemp's attorney presented an offer for a consent judgment of more than $5 million in exchange for a covenant not to execute the judgment against any of Hudgins' assets.  Groh forwarded Kemp's offer to Hudgins and Rubenstein.  Groh acknowledged to Rubenstein that Hudgins would probably accept the offer and that Kemp would eventually file a bad faith claim against Dairyland.

The record is clear that once it became apparent that Kemp would be asserting a bad faith claim, Groh shifted his representation from Dairyland to Hudgins.  All correspondence from Groh after that point was on behalf of Hudgins, and Groh filed pleadings on behalf of Hudgins in the underlying suit.  Dairyland was thereafter represented by attorneys Foland and Maloney. Neither Dairyland nor Hudgins responded to Kemp's June 21 offer by the July 12 deadline. However, four days before this deadline passed, Foland offered to settle with Kemp for the policy limits, in exchange for a release of Hudgins only—the same offer that Carter had explicitly made in January that Dairyland had rejected on the basis that it owed a duty of good faith to seek a release of both insureds.  Dairyland and Kemp traded correspondence on July 8 and July 12.  Although it is uncontroverted that Dairyland's attorneys did not consult with Hudgins or obtain his approval before offering the policy limits settlement in July, Copeland acknowledged in a letter to Groh on July 30 that "from their letters to me it appears that they

---

obligated to protect both of its insureds.  It is this duty of good faith to both insureds which renders the case distinct . . . and which justifies an award of summary judgment in favor of the insurer.").

forwarded copies to you."[94]  The record demonstrates that Hudgins purported to accept the June

21 settlement past the deadline provided by Copeland, and that Groh requested Copeland renew

the June 21 offer for Hudgins.  Kemp refused.

By August 2010, it was apparent that Hudgins was willing to accept Kemp's settlement

offer of a multi-million dollar judgment in exchange for immunity from personal liability, yet

Dairyland's attorneys would not agree to the provision that required it to consent to the

settlement.  Dairyland continued to counter-offer for the policy limit and a release of Hudgins.

Kemp was not amenable to this offer and frankly admits that he believed his claim was worth

more than $50,000.  Eventually, Dairyland offered to settle above policy limits in order to also

settle any bad faith claim that Kemp may later assert.  Again, Kemp declined to settle claiming

the proposed amounts were not acceptable.

*Bollinger* applies to an insurer's bad faith rejection or delay in accepting an offer to settle

within policy limits.[95]  To be sure, the Kansas Supreme Court explained in *Bollinger* that the

rationale for the doctrine is that the insured's interests "lie in keeping recovery within policy

limits, so that he will suffer no personal financial loss. . . .  When the settlement offer approaches

policy limits, the insurer has a great deal less to risk from going to trial than does the insured,

because the extent of its potential liability is fixed."[96]  After January 2010, the record

demonstrates that neither party sought to expose Hudgins to personal liability in their settlement

offers.  Dairyland never offered to settle for less than the policy limits and Kemp repeatedly

---

[94]Doc. 106-26, Ex. 67.

[95]*Roberts v. Printup*, 595 F.3d 1181, 1186 (10th Cir. 2010); *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995) ("an insurer, who wrongfully declines to defend and who refuses to accept **a reasonable settlement within the policy limits** in violation of its duty of good faith . . . is liable for the entire judgment against the insured even if it exceeds the policy limits." (emphasis added)); *Blann v. Rogers*, 22 F. Supp. 1169, 1175 (D. Kan. 2014) (finding breach of duty for  refusal to settle for policy limits); *Wade*, 483 F.3d 657 (explaining the doctrine applies to an insurance company's decision to take a case to trial rather than to accept a policy-limits settlement offer or to its delay in accepting a settlement offer.).

[96]*Bollinger*, 449 P.2d at 510.

offered to settle for amounts far in excess of the policy limits, with a provision that Hudgins would suffer no personal financial liability and would assign his bad faith claim to Kemp. After January 29, 2010, Dairyland never refused or delayed in accepting a policy limits settlement offer. Therefore, the Court cannot find that the bad faith doctrine applies to Dairyland's conduct during this time period.

While it is true that Kemp's circumstances changed between the January and July offers because he incurred litigation expenses, his subsequent settlement offers were certainly not designed to compensate for this relatively limited change of circumstance.[97] His offer went from the $50,000 policy limit in January 2010, to a multi-million dollar consent judgment six months later in June. Given that Kemp's total expenses were less than $8000, the Court cannot find that Kemp's settlement offers after January 29 were reasonable. Moreover, because the bad faith doctrine only applies to a refusal to settle or delayed acceptance of a policy limits settlement offer, any failure to inform Hudgins of the settlement offers is not actionable.[98] The duty to communicate only arises when there is a refusal or delay in accepting a settlement offer for policy limits.[99] Dairyland remained open to settling for policy limits, therefore it never refused or delayed acceptance of a settlement offer during the period after the original settlement discussions fell through. The Court finds that the bad faith doctrine does not apply to Dairyland's conduct after the lawsuit was filed.

Even if after weighing the *Bollinger* factors there was a genuine issue of material fact about whether Dairyland negligently or in bad faith failed to settle, no reasonable jury could

---

[97]Under the fee agreement, Kemp would not have paid any attorneys' fees had the parties reached a policy limits settlement.

[98]*See Brummett*, 2005 WL 1683610, at *13.

[99]*See Brummett*, 2005 WL 1683610, at *13; *Wade*, 483 F.3d at 667–68 (explaining how the *Bollinger* factors apply to refusals to settle and delayed acceptance).

conclude that Dairyland's conduct after the lawsuit was filed caused the excess judgment.  The parties agree that two Tenth Circuit decisions govern the causation inquiry: *Wade v. EMCASCO Insurance Co.*,[100] and *Roberts v. Printup*.[101]  Both cases deal with an insurer's delay in handling a policy limits offer by the insured.

In *Wade*, the Tenth Circuit explained that an insured may recover on a bad faith claim "for those excess judgment losses 'directly and naturally resulting from the breach.'"[102]

> There are a number of reasons why an insurer's delay in attempting to settle a claim might set up a natural and continuous sequence of events that causes a claimant to reject a policy-limits settlement offer that he would have accepted earlier.  For example, a claimant who has invested time and resources preparing for trial might want the settlement agreement to reflect those added expenses.  But if a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle.[103]

In *Wade*, the uncontroverted facts showed that the Plaintiff's motive in rejecting the insurance company's policy limits settlement offer was to set up a bad faith claim.  Members of the legal team testified in deposition and admitted in correspondence that this was the basis for rejection of the offer.  The court determined that the claimant rejected the original policy limits settlement offer by the insurer "as part of a strategy to establish a bad faith claim."[104]  The court concluded that it "would be turning the cause of action on its head by holding an insurance company liable where it eventually offered to settle the claim for the policy limits, but a claimant rejected the

---

[100]483 F.3d 657 (10th Cir. 2007).

[101]595 F.3d 1181 (10th Cir. 2010).

[102]*Wade*, 483 F.3d at 674 (quoting *Sours v. Russell*, 967 P.2d 348, 351–52 (Kan. Ct. App. 1998)).

[103]*Id.* (citations omitted).

[104]*Id.*

offer precisely in order to manufacture a lawsuit against the insurer for bad-faith refusal to settle."[105]

Three years later, the court considered the causation question again in *Roberts*, where the claimant sent a policy limits settlement offer to the insurance company with a ten-day deadline that was tied to the expiration of her statute of limitations.[106]  The plaintiff had executed a contract with her attorney that if the offer was accepted by the ten-day deadline, she would not owe attorney fees and would avoid filing a Complaint against the driver of the vehicle, who was her son.  The insurance company mistakenly routed the offer letter to the wrong department, and as a result, accepted the claimant's offer after the deadline had expired.  The court again considered whether the insurer's conduct caused the excess judgment, and found that it did.[107]  The court found that the claimant's ten-day deadline was not arbitrary and was reasonable under the circumstances.[108]  The court found that the insurer's negligence in failing to implement a system for responding to time-sensitive offers caused the insured's exposure to the excess judgment because its delay required the claimant to file the lawsuit to protect herself from the expiration of the statute of limitations and unwanted attorney fees.[109]

Dairyland urges that, as in *Wade*, Kemp's sole motivation for rejecting Dairyland's policy limits settlement offer was to manufacture a bad faith claim.  The Court agrees.  The uncontroverted evidence establishes that Kemp rejected each policy limit settlement proposal after the lawsuit was filed because he did not believe that the policy limits sufficiently covered his claim.  Moreover, the fee agreement between Kemp and Copeland and Copeland's June 21

---

[105] *Id.*

[106] 595 F.3d at 1184.

[107] *Id.* at 1190–91.

[108] *Id.* at 1190.

[109] *Id.* at 1190–91.

stipulated judgment offer make clear that he sought to recover under a bad faith theory.  The fee agreement provided that Copeland would only be paid if he recovered more than the policy limits on behalf of Kemp.  And Kemp's multi-million dollar stipulated judgment offer made clear that Kemp was not interested in settling the claim for the policy limit.  While Kemp's circumstances changed in terms of his litigation expenses after January 2010, he would not have incurred attorneys' fees had he accepted Dairyland's March or July policy limit offers.  This case is not analogous to *Roberts*—that case involved evidence that the insurer missed a reasonable deadline set by the claimant to accept a policy limits settlement.  Again, Kemp never offered a policy limits settlement after January 2010, and Dairyland repeatedly offered to settle for its policy limit.  For all of these reasons, no reasonable jury could conclude that Dairyland's conduct after January 2010 caused the excess judgment in this case.  Kemp's settlement proposals establish that even if Dairyland accepted his offers, an excess judgment would have been entered in this case and Kemp would have pursued a bad faith claim against Dairyland to recover that amount.

**IT IS THEREFORE ORDERED** that Dairyland's Motion for Summary Judgment (Doc. 57) is **granted**, and Kemp's Motion for Leave to File Surreply (Doc. 113) is **granted**.

**IT IS SO ORDERED.**


Dated: <u>September 22, 2015</u>

         S/ Julie A. Robinson
         JULIE A. ROBINSON
         UNITED STATES DISTRICT JUDGE